1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   JOHN H. GEORGE (292332)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  jgeorge@rgrdlaw.com

7  ROBBINS GELLER RUDMAN
      & DOWD LLP
8  PATTON L. JOHNSON (320631)
   655 West Broadway, Suite 1900
9  San Diego, CA  92101
   Telephone:  619/231-1058
10 619/231-7423 (fax)
   pjohnson@rgrdlaw.com

11
   Lead Counsel for Plaintiff

12
                        UNITED STATES DISTRICT COURT

13
                       NORTHERN DISTRICT OF CALIFORNIA

14

15 CHARLES REIDINGER, Individually and on )   Case No. 3:19-cv-06968-CRB
   Behalf of All Others Similarly Situated,  )   (**Consolidated**)
                                             )
16                        Plaintiff,         )   CLASS ACTION
                                             )
17        vs.                                )   LEAD PLAINTIFF'S SECOND AMENDED
                                             )   CLASS ACTION COMPLAINT FOR
18 ZENDESK, INC., et al.,                    )   VIOLATION OF THE FEDERAL
                                             )   SECURITIES LAWS
19                        Defendants.        )
                                             )
20

21

22

23

24

25

26

27

28

1. Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Zendesk, Inc. ("Zendesk" or the "Company"), as well as media and analyst reports about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. This is a securities fraud class action on behalf of all purchasers of Zendesk common stock between February 15, 2019 and October 1, 2019, inclusive (the "Class Period"),[1] seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3. On November 9, 2020, the Court issued an Order Granting Motion to Dismiss with Leave to Amend (ECF No. 63) ("MTD Order"), which dismissed Lead Plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 51) ("Complaint") with leave to amend. The MTD Order found that the Complaint's allegations concerning Zendesk's performance and leadership in two regions – Europe, the Middle East and Africa ("EMEA") and Asia Pacific ("APAC") – were insufficient to plead a §10(b) or §20(a) claim. Specifically, the Court found that the alleged EMEA and APAC false statements were not materially false or misleading and that the Complaint failed to plead facts supporting a strong inference of defendants' scienter regarding the alleged falsity of the EMEA and APAC statements. MTD Order at 14-18. The Court, however, did find that Lead Plaintiff "plausibly alleged a material omission" concerning defendants' data security statements because "Zendesk did not disclose the existence of the data breach" that

---

[1] The beginning of the Class Period has been amended from February 6, 2019 to February 15, 2019 to correspond to the first alleged material misrepresentation (*see* ¶¶43-44). The Court found that defendants' February 5, 2019 statements were not sufficiently alleged to be materially false and misleading, and Lead Plaintiff has not realleged the falsity of the February 5 statements herein.

would have plausibly "'been viewed by the reasonable investor' as significant." *Id.* at 21. Although it found the allegations of falsity sufficient, the MTD Order determined that the Complaint failed to raise a strong inference of scienter. *Id.* at 21-22.

4. This Second Amended Complaint for Violation of the Federal Securities Laws ("SAC") alleges additional facts concerning defendants' data security misstatements that address the deficiencies noted in the Court's MTD Order.[2] Specifically, the SAC alleges that the undisclosed security breach at Zendesk originated because of the Company's ***own*** actions, including providing secret keys to sensitive information stored with Amazon Web Services ("AWS") to third parties. *See* ¶¶25-26, 64. In addition, the SAC alleges facts showing that, contrary to defendants' misrepresentations about purportedly stringent and comprehensive data security, the Company failed to adhere to the minimum standards of data security for information stored on AWS, including Amazon's admonition to its clients like Zendesk to "***[n]ever share your AWS . . . access keys with anyone***," use multi-factor authentication (which requires multiple unique entries to gain access), strictly limit others' access to the information and closely monitor what information on AWS is accessed and by whom. *See* ¶¶27, 64. Further, these basic security measures, which Zendesk did not follow, were practices that Zendesk itself recommended to its own clients. *See* ¶¶28, 46. Moreover, the SAC alleges facts showing Zendesk did not implement many of the basic security measures advised by Amazon until ***after*** the breach was discovered. *See* ¶¶25-26, 55, 64.

## BACKGROUND

5. Zendesk is a software development company that provides customer-support products designed to help its customers better communicate with and serve their customers. The Company was founded in 2007 in Copenhagen, Denmark and has its headquarters in San Francisco, California. On May 15, 2014, the Company completed its initial public offering ("IPO"). Zendesk's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZEN."

---

[2]   In light of the rulings in the Court's November 9, 2020 MTD Order, Lead Plaintiff has not renewed its allegations concerning Zendesk's statements regarding EMEA and APAC performance and leadership or claims against Norman Gennaro.

6.      Zendesk's flagship product is "Zendesk Support," a system for tracking and prioritizing customer service requests (also known as "tickets"), which generates "substantially all of [Zendesk's] revenue and cash flows."[3]  The Company also provides "Zendesk Chat," software that allows businesses to engage in text conversations with their customers.

7.      Zendesk sells its products to companies that use them to interact with the companies' own customers.  Zendesk refers to its customers' employees who use Zendesk services, such as Support and Chat, as "agents."  Zendesk calls the customers of its customers "end users."  For example, an Uber customer service employee who uses Zendesk services to address customer complaints is an "agent," and an Uber passenger who contacts that employee about a problem is an "end user."

8.      Instead of hosting and storing all of its programs, applications and other data on its own physical servers, Zendesk began using cloud computing services from AWS in 2016.[4]  Zendesk completed its transition to hosting its information on AWS in 2019.

9.      Zendesk has historically and consistently collected, stored and transmitted, through its core business of providing customer support products and services, significant amounts of sensitive data, including personally identifying information, about its customers, agents and end users.  For example, in its May 16, 2014 IPO prospectus, Zendesk described the Company's collection and use of such data:

> Use of our customer service platform and live chat software involve the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information regarding their customers or employees.[5]

---

[3]   2018 annual report filed on SEC Form 10-K ("FY18 Form 10-K").  "FY__" refers to fiscal year followed by the end digits of the relevant year (*e.g.*, "FY19" refers to fiscal year 2019).  "1Q_" refers to the first quarter of the relevant year, "2Q__" refers to the second quarter, etc..

[4]   Vincent De Luca, *Zendesk's Global Mesh Network – Part 1* (Oct. 29, 2019), https://medium.com/zendesk-engineering/zendesks-global-mesh-network-part-1-8f45414c5cb4.

[5]   Zendesk repeated the same or substantially similar statements concerning its collection of personal or identifying information in each of its following annual SEC filings.  *See, e.g.*, FY15 Form 10-K ("Use of our customer service platform, live chat software, and analytics software involve the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information. . . ."); FY16 Form 10-K ("Use of our products involves the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information . . . .").

10.     Because of its collection of a vast amount of its customers', agents' and end users' sensitive information, the Company repeatedly (and falsely) assured its customers and investors that its data security methodologies were comprehensive and of the highest quality.  For example, on February 14, 2019, in the Company's annual report filed on Form 10-K with the SEC, defendants falsely claimed they "**maintain a comprehensive security program**" and implemented the "**highest possible standards for protecting [personally identifiable information]**" and touted the validation of their practices by European regulators:

> **We maintain a comprehensive security program designed to help safeguard the security and integrity of our customers' data**.  We regularly review our security program.  **In addition, we regularly obtain third-party security audits and examinations of our technical operations and practices covering data security**.
>
> *                *                *
>
> In June 2017, we announced that we completed the EU approval process for our global Binding Corporate Rules ("BCRs") as a data processor and controller.  This significant regulatory approval **validated our implementation of the highest possible standards for protecting PII [personally identifiable information] globally, covering both the PII of our customers and employees**.

11.     Zendesk's February 14, 2019 Form 10-K also purported to warn investors of the risks that "**may**" result "**if**" a breach or unauthorized access to the sensitive data it collected from its customers were to occur:

> **If our network or computer systems are breached or unauthorized access to customer data is otherwise obtained, our products may be perceived as insecure, we may lose existing customers or fail to attract new customers, and we may incur significant liabilities**.
>
> Use of our products involves the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information regarding their customers or employees.  Unauthorized access to or security breaches of our products **could** result in the loss of data . . . .

12.     On May 2, 2019 and August 2, 2019, Zendesk repeated these same "warnings" in its Forms 10-Q for 1Q19 and 2Q19.  *See* ¶¶47, 49.

13.     During the Class Period, Zendesk also made numerous claims on its website about its security practices to convince customers and investors that data security "is not something we take lightly," including providing specific technical details regarding the types of certifications and protocols it supposedly employed and claiming it followed "industry best practices":

**Zendesk Security**

More than 120,000 customers trust Zendesk with their data. This is ***not something we take lightly. We combine enterprise-class security features with comprehensive audits of our applications, systems, and networks to ensure customer and business data is always protected***. And our customers rest easy knowing their information is safe, their interactions are secure, and their businesses are protected.

**Data center and network security**

We ensure the confidentiality and integrity of your data with ***industry best practices***.

\*       \*       \*

**Compliance certifications and memberships**

We implement ***security best practices to meet not just industry-based compliance, but the most stringent requirements***.

**Best practices**

Zendesk provides a range of security options to ensure data is protected and secure. But an ounce of prevention is worth a pound of cure.

14. The Company, in its Binding Corporate Rules adopted as part of the EU approval process referenced in the February 14, 2019 Form 10-K, specifically acknowledged that it would comply with ***its own data security policies*** and "***with any other security procedures relevant to a business area or function***" and that compliance would be overseen by a Chief Privacy Officer and a team of executives dedicated to data security:

**Binding Corporate Rules: Controller Policy**

\*       \*       \*

**Zendesk will adhere to its security policies.**

Zendesk will implement appropriate technical and organizational measures to protect personal information against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access, in particular where processing involves transmission of personal information over a network, and against all other lawful forms of processing. . . .

To this end, ***Zendesk will comply with the requirements in the security policies in place within Zendesk***, as revised and updated from time to time, ***together with any other security procedures relevant to a business area or function***. Zendesk will implement and comply with breach notification policies as required by applicable data protection law.

\*       \*       \*

Zendesk has appointed its **Chief Privacy Officer to oversee and ensure compliance with this Policy**. The Chief Privacy Officer is supported by the Zendesk Privacy Counsel, which is responsible for overseeing and enabling day-to-day compliance with this Policy at a regional and compliance level.[6]

15.     The Company also stressed in its Master Subscription Agreement – which Zendesk's Privacy Policy said "detailed" and "governed" the Company's "security and privacy practices" – that "**any third-party service providers that are utilized by the Zendesk Group will only be given access to Your Account and Service Data as is reasonably necessary to provide the Service**" and would further be required to adhere to a number of "technical and organizational security measures." During the Class Period, Zendesk published its Master Subscription Agreement and Privacy Policy on its website.

16.     It was imperative that Zendesk assure investors its data security was comprehensive and that it had the "highest possible standards for protecting PII" as the Company had previously been hacked and lost its agents' and end users' personal information. For example, on February 21, 2013, defendant Mikkel Svane posted on Zendesk's website that a hacker had downloaded e-mail addresses and other information submitted by end users of three of the Company's customers:

**We've Been Hacked**

\*        \*        \*

We've become aware that a hacker accessed our system this week. As soon as we learned of the attack, we patched the vulnerability and closed the access that the hacker had. Our ongoing investigation indicates that **the hacker had access to the support information that three of our customers store on our system**. We believe that **the hacker downloaded email addresses of users who contacted those three customers for support, as well as support email subject lines**. We notified our affected customers immediately and are working with them to assist in their response.

17.     According to the February 21, 2013 *Wired* article, "Zendesk Security Breach Affects Twitter, Tumblr and Pinterest," the three companies affected were Twitter, Tumblr and Pinterest, and the hacker also stole end users' phone numbers in addition to e-mails.

18.     On June 8, 2016, the BBC reported that Svane's Twitter account had been hacked. According to the article, "Zendesk chief's Twitter account hacked," the breach was "embarrassing"

---

[6]   Zendesk's Chief Privacy Officer during the Class Period was John Geschke, the Company's Chief Legal Officer since May 2017 and General Counsel from 2012 through 2017.

for Zendesk, which "says it takes 'the most stringent' security measures." The article also noted that Twitter allows users to employ "two-stage authentication" (also known as multi-factor authentication or verification), which requires users to "type in a code texted to their phone in addition to their password when logging in." In fact, the article posted a screenshot of a data security expert's tweet to Svane and Zendesk advising them: "now would be a good time for a decent password and multi step verification."

19. Each of the above-referenced statements in ¶¶10-12 was materially false and misleading when made as defendants knew or deliberately disregarded and failed to disclose the following facts:

(a) Contrary to Zendesk's claims, including that it had a "comprehensive security system" that was up to the "highest possible standards," the Company did not follow basic precautions to secure data hosted by AWS. Despite Amazon's explicit warning to "*[n]ever share your AWS . . . access keys with anyone*," the Company shared AWS keys with third parties, thus allowing hackers to "access customer service data *across [Zendesk's] production environment*."

(b) Zendesk also only implemented multi-factor authentication *after* it had provided AWS keys to others and *after* it had been breached as a result; and the Company, inconsistent with AWS best practices, also failed to properly "*use logging features in AWS* to determine the actions users have taken in your account and the resources that were used."

(c) Zendesk, as a result of its failure to implement basic data security standards and best practices, had *already* suffered a significant breach, exposing personally identifying information and other sensitive data belonging to approximately 22,000 customer accounts, including agent and end user e-mail addresses, passwords and authentication information.

20. As a result of these misrepresentations, the Company's stock traded at artificially inflated prices as high as $94.89 per share during the Class Period.

21. On September 24, 2019, Zendesk reportedly identified that it had experienced a data breach nearly three years earlier, prior to November 2016, involving personally identifiable information for approximately 15,000 Support and Chat customer accounts and authentication

information for an additional approximately 7,000 customer accounts.[7]  An article on the online publishing platform *Medium.com* titled: "Zendesk – Discloses 2016 Data Breach after Three Years *i.e.* On September 24, 2019" later confirmed that "[o]n September 24, 2019, Zendesk discloses this breach explicitly."[8]

22.     On September 24, 2019, Zendesk's stock price dropped significantly, closing at $73.60 per share, or 4.70% lower than its prior close of $77.23, on unusually high volume of more than 2.3 million shares traded, nearly twice the average daily volume over the preceding ten trading days.

23.     On October 2, 2019, Zendesk published on its website an "Important Notice regarding 2016 Security Incident," which stated that it identified a data breach involving approximately 10,700 customer accounts (two days later upwardly revised to having actually identified **22,000** breached customer accounts), that the breach had occurred prior to November 2016 and that Zendesk had learned about the breach prior to September 24, 2019.  Specifically, hackers stole "email addresses, names and phone numbers of agents and end users," as well as agents' and end users' passwords and authentication information for other customers:

> **Important Notice regarding 2016 Security Incident**
>
> We recently were alerted by a third party regarding a security matter that may have affected the Zendesk Support and Chat products and customer accounts of those products activated prior to November of 2016.
>
> \*       \*       \*
>
> ***On September 24, we identified approximately 10,000 Zendesk Support and Chat accounts . . . whose account information was accessed without authorization prior to November of 2016.***

---

[7]     According to Zendesk's 2016 annual report filed on SEC Form 10-K, it had 94,300 customer accounts, including 50,800 Support accounts and 41,300 Chat accounts, as of December 31, 2016. According to the Company's 2019 annual report filed on SEC Form 10-K, as of December 31, 2019, Zendesk had 157,000 customer accounts, including 81,200 Support accounts and 42,600 Chat accounts.

[8]     Emily Daniel, *Zendesk-Discloses 2016 Data Breach after Three Years i.e. On September 24, 2019*, Medium (Oct. 22, 2019), https://medium.com/datadriveninvestor/zendesk-discloses-2016-data-breach-after-three-years-i-e-on-september-24-2019-820d14fa0bea.   Google search results indicate the article was first published on September 24, 2019; however, the post is dated October 22, 2019.

*[T]he information accessed from these databases includes the following data:*

- **Email addresses, names and phone numbers of agents and end-users of certain Zendesk products**

- Agent and end user passwords that were hashed and salted

*We have also determined that certain authentication information was accessed* for a much smaller set of approximately ***700 customer accounts***, including expired trial accounts and accounts that are no longer active.

24. Following Zendesk's post, the price of its common stock fell $2.90 per share to close at $69.81 per share on October 2, 2019 on unusually high trading volume.

25. On November 22, 2019, Zendesk published on its website an "Updated Notice Regarding 2016 Security Incident," which identified the cause of the security breach as several "AWS keys" – secret codes used to gain access to Zendesk information hosted on AWS – that the Company provided to "a third party vendor" and which were used to access PII "across [Zendesk's] production environment":

During our review, we discovered that a small number of ***AWS keys used by Zendesk to access our AWS environment, were compromised after having been provided to a third party vendor. These keys were then used to access customer service data across our production environment***.

26. Zendesk also revealed that it had newly implemented multi-factor authentication, which, had it done previously as recommended by AWS, would have protected the stolen information, increased log monitoring and taken other recommended data security precautions ***after*** the PII was compromised:

We also have taken additional actions since the incident occurred in order to further enhance our security protocols. For example, we have rolled out several changes since 2016, including:

- ***Expanded Single Sign On and Multi-Factor Authentication across our environment. This roll-out took place during 2016 and 2017. The services affected by this incident are now protected by these technologies***;

- ***Increased security monitoring and logging***. We have upgraded our security monitoring stack, with increased monitoring of logs;

- Increased security scanning, both at an application and infrastructure level: We increased the level and frequency of security scanning we perform, both at an application and infrastructure level. With our migration to AWS completed in June of 2019, we have improved our ability to patch and remediate security vulnerabilities.

27.     In 2016, prior to the Zendesk breach, AWS published a list of "Best Practices" to secure information on AWS, which specifically warned customers like Zendesk to "***[n]ever share your AWS account password or access keys with anyone***," use multi-factor authentication, strictly limit the information others have access to when granting access, limit the time period that others are able to access information and closely monitor logs to see what information is accessed by whom:

> ***Never share your AWS*** account password or ***access keys with anyone***.  The remaining sections of this document discuss various ways to avoid having to share your account credentials with other users and to avoid having to embed them in an application.
>
> *          *          *
>
> **Create individual IAM [Identity and Access Management] users**
>
> Don't use your AWS root account credentials to access AWS, and ***don't give your credentials to anyone else***.  Instead, create individual users for anyone who needs access to your AWS account.
>
> *          *          *
>
> **Grant least privilege**
>
> When you create IAM policies, follow the standard security advice of granting least privilege – that is, ***granting only the permissions required to perform a task***.  Determine what users need to do and then craft policies for them that let the users perform only those tasks.
>
> *          *          *
>
> **Enable MFA for privileged users**
>
> For extra security, ***enable multifactor authentication (MFA) for privileged IAM users (users who are allowed access to sensitive resources*** or APIs).  With MFA, users have a device that generates a unique authentication code (a one-time password, or OTP) and users must provide both their normal credentials (like their user name and password) and the OTP.
>
> *          *          *
>
> **Delegate by using roles instead of by sharing credentials**
>
> You might need to allow users from another AWS account to access resources in your AWS account.  If so, ***don't share security credentials, such as access keys,*** between accounts. . . .
>
> **Rotate credentials regularly**
>
> Change your own passwords and access keys regularly, and make sure that all IAM users in your account do as well.  ***That way, if a password or access key is compromised without your knowledge, you limit how long the credentials can be***

*used to access your resources*. You can apply a password policy to your account to require all your IAM users to *rotate their passwords*, and you can choose how often they must do so.

*     *     *

**Use policy conditions for extra security**

To the extent that it's practical, define the conditions under which your IAM policies allow access to a resource. For example, you can write conditions to *specify a range of allowable IP addresses that a request must come from, or you can specify that a request is allowed only within a specified date range or time range*. . . .

**Monitor activity in your AWS account**

You can use logging features in AWS *to determine the actions users have taken in your account and the resources that were used*. The log files show the time and date of actions, the source IP for an action, which actions failed due to inadequate permissions, and more.

28. In fact, in an April 1, 2019 post on its website titled: "Security best practices," Zendesk advised its own customers to never give out passwords, routinely audit and monitor accounts, and use multi-factor authentication. Zendesk stressed that "*even the best security policies will fall short if they are not followed*" and that it "strongly recommends that agents and administrators be trained to follow the best practices."[9]

29. Despite the clear directions to adhere to such basic security measures as "*never*" providing AWS keys to others, using multi-factor authentication, closely monitoring who accessed what data and strictly limiting those with access to the least amount of data necessary, Zendesk provided its AWS keys to third parties and failed to use other common security practices it advised others to employ and was predictably breached as a result.

30. Lead Plaintiff and the Class seek to recover economic loss caused by the alleged misrepresentations and omissions.

**JURISDICTION AND VENUE**

31. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and78(t)a,

---

[9] Zendesk made substantially identical recommendations and advisements to its clients in 2016.

1  and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the

2  subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3      32.    Venue is proper in this District pursuant to §27 of the Exchange Act as Zendesk is

4  headquartered in this District, and many of the false and misleading statements alleged herein were

5  disseminated from this District.

6      33.    In connection with the acts alleged in this Second Amended Complaint, defendants,

7  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

8  limited to, the mails, interstate telephone communications and the facilities of the national securities

9  markets.

10                                          **PARTIES**

11     34.    Lead Plaintiff Local 353, I.B.E.W. Pension Fund purchased Zendesk common stock

12  during the Class Period, as set forth in the certification filed on December 23, 2019 (ECF No. 32-2),

13  and suffered damages as a result of the misconduct alleged herein.

14     35.    Plaintiff Charles Reidinger purchased Zendesk common stock during the Class Period

15  and suffered damages as a result of the misconduct alleged herein.

16     36.    Defendant Zendesk is a San Francisco, California-based software development

17  company that provides customer support software for organizations. Zendesk common stock is

18  listed and trades on the NYSE, an efficient market, under the ticker symbol "ZEN." As of

19  October 1, 2019, the Company had approximately 112 million shares issued and outstanding.

20     37.    Defendant Mikkel Svane ("Svane") is, and was at all relevant times, a co-founder and

21  Chief Executive Officer ("CEO") of Zendesk and the Chairman of its Board of Directors. As CEO,

22  Svane had the power to authorize or approve publicly disseminated information about the Company,

23  was regularly quoted in Zendesk's press releases, regularly spoke on Zendesk's quarterly earnings

24  calls to discuss financial results with analysts and investors, regularly made live presentations at

25  analyst-sponsored investor conferences, authored the Company's quarterly Shareholder Letters and

26  signed or authorized all of Zendesk's reports filed with the SEC. During the Class Period, Svane

27  sold 250,000 shares of his personally held Zendesk stock, reaping $19,670,225 in proceeds.

28

38.     Defendant Elena Gomez ("Gomez") is, and was at all relevant times, Chief Financial Officer ("CFO") of Zendesk.  As CFO, Gomez had the power to authorize or approve publicly disseminated information about the Company, was regularly quoted in Zendesk's press releases, regularly spoke on Zendesk's quarterly earnings calls to discuss financial results with analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, authored the Company's quarterly Shareholder Letters and signed or authorized all of Zendesk's reports filed with the SEC.  During the Class Period, Gomez sold 42,455 shares of her personally held Zendesk stock, reaping $3,526,791 in proceeds.

39.     Svane and Gomez are referred to collectively herein as the "Individual Defendants" and, together with Zendesk, as "defendants."

## CONTROL PERSONS

40.     As officers and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information about the Company and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom and were aware of their materially false and misleading nature.  Because of their board memberships and/or executive and managerial positions with Zendesk, both of the Individual Defendants had access to the adverse undisclosed information about the Company's data security as particularized herein and knew or deliberately disregarded that these adverse facts rendered the positive representations made by Zendesk materially false and misleading.

42.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to (and did) control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

43. On February 14, 2019, after the market closed, Zendesk filed with the SEC its FY18 annual report on Form 10-K. Svane and Gomez signed the Form 10-K, and each certified its accuracy, as well as their involvement in designing and testing the Company's internal controls, pursuant to the Sarbanes-Oxley Act of 2002. In the Form 10-K, Zendesk emphasized the Company's "comprehensive security program" to secure sensitive customer information, including its "implementation of the highest possible standards":

> **Security**. Each of our products are designed to host a large quantity of customer data. *We maintain a comprehensive security program designed to help safeguard the security and integrity of our customers' data*. We regularly review our security program. *In addition, we regularly obtain third-party security audits and examinations of our technical operations and practices covering data security*.
>
> \*     \*     \*
>
> In June 2017, we announced that we completed the EU approval process for our global Binding Corporate Rules ("BCRs") as a data processor and controller. This significant regulatory approval *validated our implementation of the highest possible standards for protecting PII [personally identifiable information] globally, covering both the PII of our customers and employees*.[10]

---

[10] On June 6, 2017, Zendesk issued the following press release:

> **Zendesk Adheres To Highest Standards Of Data Protection With European BCR Approval**
>
> Zendesk, Inc. (NYSE: ZEN) a leading provider of software for better customer relationships, today announced that it has completed the EU approval process with the Irish DPC (peer reviewed by both the Information Commissioner's Office (ICO) and the Dutch Data Protection Authority (DPA)) for its global Binding Corporate Rules (BCRs) as data processor and controller. This significant regulatory approval *validates Zendesk's implementation of the highest possible standards for protecting personal data globally, covering both the personal data of its customers and its employees*.

44. Zendesk's FY18 Form 10-K also purported to warn investors of certain **potential** risks to Zendesk "**if**" the Company's network or computer systems were to be breached:

> **If our network or computer systems are breached or unauthorized access to customer data is otherwise obtained, our products may be perceived as insecure, we may lose existing customers or fail to attract new customers, and we may incur significant liabilities**.
>
> Use of our products involves the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information regarding their customers or employees. Unauthorized access to or security breaches of our products **could** result in the loss of data.
>
> \*     \*     \*
>
> Because the techniques used and vulnerabilities exploited to obtain unauthorized access to or to sabotage systems change frequently and generally are not identified until they are launched against a target, we may be unable to anticipate these techniques or vulnerabilities or to implement adequate preventative measures. We **may** also experience security breaches that may remain undetected for an extended period.

45. On February 15, 2019, following the Company's 4Q18 and FY18 financial results, the Company's stock price traded at artificially inflated prices of $79.31 per share.

46. Zendesk, in an April 1, 2019 post on its website titled: "Security best practices," advised its own customers to never give out passwords, routinely audit and monitor accounts and use multi-factor authentication and explicitly warned that "**even the best security policies will fall short if they are not followed**":

> ### Security best practices
>
> \*     \*     \*
>
> By following the best practices listed in this document, you will reduce the risk of a security breach. However, **even the best security policies will fall short if**

---

"We firmly believe in delivering certainty to our customers for the protection of their data. The approval of our BCRs is significant for us and demonstrates our ongoing commitment to protecting the privacy of personal data at Zendesk," said John Geschke, general counsel and senior vice president of administration at Zendesk. . . .

"This provides further confirmation that Zendesk is a global business **that values security and data privacy at its core**," said John Crossan, vice president EMEA at Zendesk. "As a result of the Irish DPC's approval of our BCRs, companies across Europe know when they deal with Zendesk, they are dealing with **one of the most secure customer relationship software providers globally with the highest data protection standards available today**."

***they are not followed***. Zendesk strongly recommends that agents and administrators be trained to follow the best practices and ensure a secure environment.

**Increase password security for your agents**

At the highest level of security, agents are required to choose a new password ***every 90 days***.

*       *       *

Finally, you can ***require 2-factor authentication for all agents and admins***. . . .

**Never give out user names, email addresses, or passwords**

While there is a fine line between meeting the needs of your users and maintaining security, ***best practices are that Zendesk agents and administrators should never give out user names, email addresses or passwords***.

*       *       *

**Routinely audit your Zendesk account**

If you follow all of the above techniques, your Zendesk account should always be private and secure. However, ***it is still considered best practice to routinely check for suspicious activity***.

*       *       *

**Encourage agents to monitor their user account**

Since agents have a more privileged role, they can be the canary in the coal mine indicating when a hacker has just gained unauthorized access to your Zendesk. . . .

[A]gents can conveniently monitor their user account by enabling email alerts for logins from new devices (see Checking devices and applications that accessed your account in the Zendesk Agent Guide). ***If you see a new login from a suspicious location, remove this device*** to end the user's session, ***then choose a new password***.

*       *       *

***[W]e recommend that you and your users take advantage of the two-factor authentication (also known as multi-factor authentication)*** that these services provide. This adds another layer of protection by requiring additional proof of identity.

47. On May 2, 2019, after the market closed, Zendesk filed with the SEC its Form 10-Q for the quarter ended March 31, 2019, which was signed by Gomez and falsely stated that Zendesk merely ***could*** suffer a security breach and its consequences "***if***" such a breach occurred, when, as it

would later be disclosed, such a wide-reaching breach had already occurred due to the Company's own failure to adhere to basic data security standards:

> ***If our network or computer systems are breached or unauthorized access to customer data is otherwise obtained, our products may be perceived as insecure, we may lose existing customers or fail to attract new customers, and we may incur significant liabilities***.

> Use of our products involves the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information regarding their customers or employees. Unauthorized access to or security breaches of our products ***could*** result in the loss of data . . . .

> \*      \*      \*

> Because the techniques used and vulnerabilities exploited to obtain unauthorized access to or to sabotage systems change frequently and generally are not identified until they are launched against a target, we may be unable to anticipate these techniques or vulnerabilities or to implement adequate preventative measures. We ***may*** also experience security breaches that may remain undetected for an extended period.

48. On May 3, 2019, following the 1Q19 Form 10-Q, Zendesk's stock price traded at artificially inflated prices of $87.09 per share.

49. On August 2, 2019, Zendesk filed with the SEC its Form 10-Q for the quarter ended June 30, 2019. The Form 10-Q, which was signed by Gomez, falsely stated that Zendesk ***could*** suffer a security breach and its consequences ***if*** such a breach were to occur, when in fact such a breach had already occurred:

> ***If*** our network or computer systems are breached or unauthorized access to customer data is otherwise obtained, our products may be perceived as insecure, we may lose existing customers or fail to attract new customers, and we may incur significant liabilities.

> Use of our products involves the storage, transmission, and processing of our customers' proprietary data, including personal or identifying information regarding their customers or employees. Unauthorized access to or security breaches of our products ***could*** result in the loss of data . . . .

> Because the techniques used and vulnerabilities exploited to obtain unauthorized access to or to sabotage systems change frequently and generally are not identified until they are launched against a target, we may be unable to anticipate these techniques or vulnerabilities or to implement adequate preventative measures. We ***may*** also experience security breaches that may remain undetected for an extended period.

50.     Each of the above-referenced statements in ¶¶43-44, 47 and 49 was materially false and misleading when made as defendants knew or deliberately disregarded and failed to disclose the following facts:

(a)     Contrary to Zendesk's claims, including that it had a "comprehensive security system" that was up to the "highest possible standards," the Company did not follow basic precautions to secure data hosted by AWS.  Despite Amazon's explicit warning to "*[n]ever share your AWS . . . access keys with anyone*," the Company shared AWS keys with third parties, thus allowing hackers to "access customer service data *across [Zendesk's] production environment*."

(b)     Zendesk also only implemented multi-factor authentication *after* it had provided AWS keys to others and *after* it had been breached as a result; and the Company, inconsistent with AWS best practices, also failed to properly "*use logging features in AWS* to determine the actions users have taken in your account and the resources that were used."

(c)     Zendesk, as a result of its failure to implement basic data security standards and best practices, had *already* suffered a significant breach, exposing personally identifying information and other sensitive data belonging to approximately 22,000 customer accounts, including agent and end user e-mail addresses, passwords and authentication information.

### THE TRUE FACTS BEGIN TO BE DISCLOSED

51.     On September 24, 2019, Zendesk identified that it had experienced a data breach approximately three years earlier, in November 2016, involving personally identifying information for approximately 15,000 Support and Chat customer accounts and authentication information for approximately 7,000 customer accounts.  An article on online publishing platform *Medium.com* titled: "Zendesk – Discloses 2016 Data Breach after Three Years i.e. On September 24, 2019" by Emily Daniel later confirmed that "[o]n September 24, 2019, Zendesk discloses this breach explicitly."

52.     On September 24, 2019, Zendesk's stock price dropped approximately 4.7% from its closing price of $77.23 per share on September 23, 2019 to $73.60 per share, on unusually high volume of more than 2.3 million shares traded, or nearly twice the average daily volume over the preceding ten trading days.

53. Zendesk's incident response policy required all customers to be notified within 72 hours of a breach, which, based on Zendesk's statement that it confirmed the breach on September 24, would have occurred no later than September 27, 2019.[11] Zendesk's "FAQ" webpage following disclosure of the data breach confirmed that customers whose data was taken were separately notified.

54. On September 27, 2019, Zendesk's stock price declined approximately 2.7% from $74.08 per share on September 26, 2019 to $72.08 per share, on unusually high volume of more than 3.2 million shares traded, or more than twice the average daily volume over the preceding ten trading days.

55. On October 2, 2019, Zendesk published a blog post on its website titled: "Important Notice regarding 2016 Security Incident," in which it explained that it had experienced a data breach involving e-mails, passwords and potentially other personal information for approximately 10,000 customer accounts that were activated prior to November 1, 2016, as well as "authentication information" for 700 additional customer accounts:

**Important Notice regarding 2016 Security Incident**

*We recently were alerted by a third party regarding a security matter that may have affected the Zendesk Support and Chat products and customer accounts of those products activated prior to November of 2016.* While our investigation is still ongoing, on September 24, 2019, we determined that information belonging to a small percentage of customers was accessed prior to November of 2016.

\*　　\*　　\*

Once we became aware of this security matter, the Zendesk Security teams launched an investigation into the incident, including:

---

[11] Zendesk's incident response policy, publicly available on its website, provides:

**Incident Response**. We have an incident management process for security events that may affect the confidentiality, integrity, or availability of Our systems or data . . . . Unless ordered otherwise by law enforcement or government agency, You will be notified within seventy-two (72) hours of a Service Data Breach. "Service Data Breach" means an unauthorized access or improper disclosure that has been verified to have affected Your Service Data.

Zendesk.com, *How We Protect Your Service Data (Enterprise Services)* (Dec. 2 2019), https://www.zendesk.com/company/customers-partners/protect-service-data-enterprise-services/.

- Engaging a team of outside forensic experts to validate the claims of the third party and to determine the exact data and information that was exposed.

- Activating our internal data security response team and protocol. This team continues to investigate with full resources dedicated to determining how this exposure occurred.

- Informing law enforcement and the appropriate global regulatory agencies.

*On September 24, we identified approximately 10,000 Zendesk Support and Chat accounts*, including expired trial accounts and accounts that are no longer active, whose account information was accessed without authorization prior to November of 2016. *Information accessed included some personally identifiable information (PII) and other Service Data*.[12] We have found no evidence that ticket data was accessed in connection with this incident.

For impacted customers, *the information accessed from these databases includes* the following data:

- *Email addresses, names and phone numbers of agents and end-users of certain Zendesk products*, potentially up to November 2016.

- *Agent and end user passwords* that were hashed and salted – a security technique used to make them difficult to decipher, potentially up to November 2016. We have found no evidence that these passwords were used to access any Zendesk services in connection with this incident.

We have also determined that *certain authentication information was accessed for a much smaller set of approximately 700 customer accounts*, including expired trial accounts and accounts that are no longer active. This includes:

- Transport Layer Security (TLS) encryption keys provided to Zendesk by customers.

- Configuration settings of apps installed from the Zendesk app marketplace or private apps. This may include integration keys used by those apps to authenticate against third party services.

56. On October 2, 2019, *Cyberscoop.com* published an article titled: "Zendesk announces data breach impacting years-old accounts" and noted that Zendesk's announcement of the breach closely followed an announcement by DoorDash (a company Zendesk listed as one of its clients as early as August 2016) that 4.9 million of its users were affected:

Zendesk has not provided much detail about this incident, but the announcement follows a notification from the delivery service DoorDash[, which] confirmed a breach affected *4.9 million customers, workers and merchants*.

---

[12] Zendesk defines Service Data as "any information, including personal data, which is stored in or transmitted via the Zendesk services, by, or on behalf of, our customers and their end-users." Zendesk.com, *Privacy and Data* Protection, https://www.zendesk.com/company/privacy-and-data-protection/ (last updated Dec. 1, 2020).

"***A lot of times [companies] have the data indicating they've been breached***," Candace Worley, Vice President and chief technical strategist at McAfee, said of corporate cyber defense at the Aspen Institute's Cyber Summit in New York. "They just don't know it yet."[13]

57.     Consistent with DoorDash's confirmation of 4.9 million affected users, the number of people whose personal information was unlawfully accessed is likely far greater than the 22,000 customer accounts announced by Zendesk.  In general, Zendesk customers have more than one agent and can have thousands, even millions of end users.[14]  Thus, the breach affecting approximately 22,000 Zendesk customers very likely exposed many more agents' and end users' e-mails, phone numbers and other personally identifying information.

58.     On October 2, 2019, cybersecurity company and Zendesk customer RiskBased Security posted an article on its website discussing the breach and expressing frustration with the lack of disclosure as to the cause of the breach:

**Zendesk Discloses Data Breach**

\*          \*          \*

Here on the data breach research team, we read hundreds – if not thousands – of breach disclosures every year.  In fact, we've already cataloged over 5,000 breaches for 2019 in Cyber Risk Analytics.  Truth be told, we've been known to shake our heads at the lack of detail in disclosures like this.  While scant information can be mildly irritating while doing research, it's outright frustrating to be on the receiving end of the notification.  ***Was the "unauthorized access" someone stumbling across an open, unsecured database or a targeted attack?  Is there evidence data was not just accessed but also exfiltrated?  Approximately how long were the attackers in the system – how long was the data exposed?***  If the investigation is on-going, how confident should we be that our account data was not accessed?

59.     Following the October 2, 2019 disclosure, the price of Zendesk common stock fell $2.90 per share to close at $69.81 per share on October 2, 2019 on unusually high volume of more than 3.3 million shares traded.

---

[13]  Jeff Stone, *Zendesk announces data breach impacting years-old accounts*, Cyberscoop (Oct. 2 2019), https://www.cyberscoop.com/zendesk-data-breach/.

[14]  For example, Zendesk stated that Airbnb, its customer since 2011, had "millions of annual tickets," which were "all recorded in Zendesk Support." Zendesk.com, *Airbnb + Zendesk: building a powerful solution together* https://www.zendesk.com/customer/airbnb/ (last visited Jan. 8, 2021).

60. On October 3, 2019, technology website TechTarget published an article discussing the breach and questioning why the breach went undetected for nearly three years:

**Zendesk breach in 2016 affected 10,000 customers**

**Zendesk disclosed a previously undetected security incident from 2016 in which data for 10,000 customer accounts was accessed, but the disclosure is missing some key details.**

A Zendesk breach in 2016 affected thousands of accounts, but the company's disclosure is missing some key details.

\* \* \*

The blog post does not make clear when the Zendesk breach occurred, nor when the company learned of the incident and began investigating. It does state that confirmation that account data was compromised occurred on Sept. 24, 2019 and the investigation is ongoing.

It is also unclear what led to the compromised accounts – be it a cyberattack, an exposed database or other issue – *why the incident went undetected for nearly three years* or what changed with the service on Nov. 1, 2016 to prevent further issues.

61. On October 4, 2019, Zendesk updated its October 2 blog post and, without explanation, increased the number of breached customer accounts that Zendesk supposedly "identified" on September 24 from 10,000 to *15,000* and increased the number of customer accounts for which authentication information was stolen from 700 to *7,000*:

**Updated Notice Regarding 2016 Security Incident**

On September 24, we identified approximately *15,000* Zendesk Support and Chat accounts, including expired trial accounts and accounts that are no longer active, whose account information was accessed without authorization prior to November of 2016. Information accessed included some personally identifiable information (PII) and other Service Data. We have found no evidence that ticket data was accessed in connection with this incident.

\* \* \*

UPDATE: We have also determined that certain authentication information was accessed for approximately *7,000* customer accounts, including expired trial accounts and accounts that are no longer active. Upon further analysis, we also found an error and identified a group of customers who had a small number of TLS certificates accessed, almost all of which are currently expired.

62. On October 29, 2019, Zendesk held its 3Q19 investor conference call. During the call, Svane admitted that the data breach happened when Zendesk's security was in a "very different

state," despite the unchanging assurances regarding security from before 2016 through the Class Period:

> It is something that happened more than 3 years ago. So it's, of course, *something that happens when Zendesk was in a very different state of security than we are today*. And also – so we have been working with our key customers by *walking them through just the development that happened inside the company and with our security profile over those 3 years* have been a big, important part of it.

63.     Chief Security Officer Maarten Van Horenbeeck elaborated on Svane's acknowledgment on the Company's "FAQ" webpage following disclosure of the data breach including that Zendesk had made significant technical changes to its security since 2016 and doubled its security staff:

**Is my Zendesk data secure?**

> While no security measure can be considered to be 100% effective, Zendesk has significantly invested in its security program since 2016. *Since then, we have made significant investments in our Security Program, including rolling out additional protection of sensitive personal data by implementing and aligning log and data retention with the General Data Protection Regulation (GDPR); deploying Customer Controlled User Assumption (CCUA), which restricts the access Zendesk employees have to customer service data and more than doubling the size of our security team*.[15]

64.     On November 22, 2019, Zendesk published an update disclosing that its 2016 breach occurred because it had provided AWS keys to a third party:

> We recently completed our review into the security incident we announced in October, and wanted to share some additional information with you.

> As an initial matter, we note that we did not discover any affected customer information other than what we announced could have been impacted in October. During our review, *we discovered that a small number of AWS keys used by Zendesk to access our AWS environment, were compromised after having been provided to a third party vendor. These keys were then used to access customer service data across our production environment*.

> At this time we still have no evidence that customer information was actually misused. Nevertheless, as a precaution, we implemented password rotations for all active agents in Support and Chat, and all end users in Support created prior to November 1, 2016.

> In line with our previous communications, we recommend that customers take the following precautions, if you have not done so already:

---

[15]   Maarten Van Horenbeeck, *Update FAQ regarding 2016 Security Incident*, Zendesk help, https://support.zendesk.com/hc/en-us/articles/360036637793-Updated-FAQ-regarding-2016-Security-Incident- (last visited Jan. 8, 2021).

- If you installed a Zendesk Marketplace or private app prior to November 1, 2016 that saved authentication credentials such as API keys or passwords during installation, rotate all credentials for the respective app.

- In addition, if you uploaded a TLS certificate to Zendesk prior to November 1, 2016 which is still valid, upload a new certificate, and revoke the old one.

- While we have no indication at this time that other authentication credentials were accessed, customers may want to consider rotating authentication credentials used in Zendesk products prior to November 1, 2016. API Tokens in Chat do not need to be rotated.

We also have taken additional actions since the incident occurred in order to further enhance our security protocols. For example, we have rolled out several changes since 2016, including:

- ***Expanded Single Sign On and Multi-Factor Authentication across our environment. This roll-out took place during 2016 and 2017. The services affected by this incident are now protected by these technologies;***

- ***Increased security monitoring and logging.*** We have upgraded our security monitoring stack, with increased monitoring of logs;

- Increased security scanning, both at an application and infrastructure level: We increased the level and frequency of security scanning we perform, both at an application and infrastructure level. With our migration to AWS completed in June of 2019, we have improved our ability to patch and remediate security vulnerabilities.

Infrastructure as code: Most of our infrastructure is now managed through code, which is frequently validated for accuracy.

We also understand that security is an ongoing process; thus, we are continuing to evaluate ways to further improve our security posture. Key steps we are taking immediately include:

- In addition to our existing annual and quarterly third party security testing, we are conducting additional third party testing.

- Effective November 4, we have made the key security features Configurable Password Policy, Single sign-on, IP restrictions and Custom Session Expiration available at all plan levels. Customers who used SSO and MFA were less affected by this incident, and we encourage all customers to deploy these security features on their accounts.

## LOSS CAUSATION/ECONOMIC LOSS

65. During the Class Period, as detailed herein, defendants made false and misleading statements and material omissions that caused Zendesk common stock to trade at artificially inflated prices. As defendants' misrepresentations and fraudulent conduct became generally known to the market, the price of Zendesk common stock declined, as the prior artificial inflation came out of the

stock's price resulting in Lead Plaintiff's and the Class' economic loss, *i.e.*, damages, under the federal securities laws.

66. On February 14, 2019, following Zendesk's 4Q18 and FY18 financial results, the Company filed its annual report on Form 10-K with the SEC, which materially misrepresented the Company's data security by, among other omissions, failing to disclose that Zendesk did not adhere to even minimum data security recommendations and that its own actions led to the significant breach that occurred in 2016. *See* ¶¶43-44, 47, 49.

67. As alleged herein, defendants repeated and made additional false and misleading statements throughout the Class Period in their SEC filings, causing Zendesk stock to trade at artificially inflated prices and close as high as $93.74 on July 26, 2019.

68. On September 24, 2019, Zendesk identified that it had experienced a data breach in November 2016 involving the exposure and theft of personally identifying information for approximately 15,000 Support and Chat customer accounts and authentication information for approximately 7,000 customer accounts. An article on online publishing platform *Medium.com* titled: "Zendesk – Discloses 2016 Data Breach after Three Years i.e. On September 24, 2019" confirmed that "[o]n September 24, 2019, Zendesk discloses this breach explicitly." *See* ¶51.

69. On September 24, 2019, Zendesk's stock price declined significantly, closing at $73.60 per share, nearly 5% lower than the previous day's closing price of $77.23, on unusually high volume of more than 2.3 million shares traded, almost twice the average daily volume over the preceding ten trading days.

70. Zendesk's incident management process required all customers to be notified within 72 hours of a breach, which, based on Zendesk's statement that it confirmed the breach on September 24, would have occurred no later than September 27, 2019.

71. On September 27, 2019, Zendesk's stock price declined 2.7%, from $74.08 to $72.08 per share, on unusually high volume of more than 3.2 million shares traded, more than twice the average daily volume over the preceding ten trading days.

72. On October 2, 2019, Zendesk published on its website the "Important Notice regarding 2016 Security Incident" describing how the Company's systems had been breached prior to November 2016. *See* ¶55.

73. On October 2, 2019, as a result, Zendesk's stock price declined $2.90 to close at $69.81 per share, a drop of nearly 4% on unusually high volume of more than 3.3 million shares traded, more than twice the average daily volume over the preceding ten trading days.

74. As detailed herein, defendants revealed the truth concealed by the fraud through a series of partial disclosures. Each disclosure removed artificial inflation from the price of Zendesk's stock, causing economic injury to Lead Plaintiff and other members of the Class.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

75. Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

76. Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Zendesk stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Zendesk stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b) Zendesk regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Zendesk was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

77. As a result of the foregoing, the market for Zendesk stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the price of the stock. Under these circumstances, all those who transacted in Zendesk stock during the Class Period suffered similar injury through their transactions in Zendesk stock at artificially inflated prices, and a presumption of reliance applies.

78. Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other Class members purchased Zendesk stock between the time defendants misrepresented and failed to disclose material facts and the time the truth was disclosed. Accordingly, Lead Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market price for Zendesk stock and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

79. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all purchasers of Zendesk common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

80. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zendesk common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Zendesk and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

82.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented or omitted material facts about Zendesk's data security;

(c)     whether defendants knew or deliberately disregarded that their statements were materially false and/or misleading;

(d)     whether the price of Zendesk common stock was artificially inflated by defendants' misrepresentations and omissions;

(e)     whether defendants' misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(f)     the extent of damages suffered by Class members and the appropriate measure of damages.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

85.     Lead Plaintiff incorporates ¶¶1-84 by reference.

86.     During the Class Period, Zendesk and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Zendesk and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Zendesk common stock during the Class Period.

88.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Zendesk common stock. Lead Plaintiff and the Class would not have purchased Zendesk common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Svane And Gomez

89.     Lead Plaintiff incorporates ¶¶1-88 by reference.

90.     Svane and Gomez acted as controlling persons of Zendesk within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by Zendesk and disseminated to the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Each of these defendants was provided with or had unlimited

access to copies of the Company's public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     Each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the statements regarding data security that give rise to the securities violations as alleged herein and exercised the same.  Furthermore, throughout the Class Period, these defendants had access to the data and other internal reports regarding data security.

92.     As set forth above, Zendesk and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Second Amended Complaint.  By virtue of their positions as controlling persons, Svane and Gomez are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: January 8, 2021                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          SHAWN A. WILLIAMS
                                          JOHN H. GEORGE


                                          s/ Shawn A. Williams
                                          SHAWN A. WILLIAMS

                                          Post Montgomery Center
                                          One Montgomery Street, Suite 1800
                                          San Francisco, CA 94104
                                          Telephone: 415/288-4545
                                          415/288-4534 (fax)
                                          shawnw@rgrdlaw.com
                                          jgeorge@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          PATTON L. JOHNSON
                                          655 West Broadway, Suite 1900
                                          San Diego, CA 92101
                                          Telephone: 619/231-1058
                                          619/231-7423 (fax)
                                          pjohnson@rgrdlaw.com

                                          Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 8, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Shawn A. Williams

SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-06968-CRB Reidinger v. Zendesk, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Nicole Lynn Chessari**
  nchessari@goodwinprocter.com,dkemp@goodwinprocter.com

- **John Hamilton George**
  jgeorge@rgrdlaw.com,sbloyd@rgrdlaw.com

- **Hayes Phillips Hyde**
  hhyde@goodwinlaw.com,GRossman@goodwinlaw.com,SCRobinson@goodwinlaw.com

- **Frank James Johnson**
  frankj@johnsonfistel.com,michaelf@johnsonfistel.com,kristeno@johnsonfistel.com,ceciliar@johnsonfistel.com,paralegal@johnsonfistel.com,brettm@johnsonfistel.co

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,PJohnson2019@ecf.courtdrive.com

- **Michael T. Jones**
  mjones@goodwinlaw.com,HHyde@goodwinlaw.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@poml

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,cbarrett@rgrdlaw.com,ShawnW@ecf.courtdrive.com,PJohnson@rgrdlaw.com,e_file_sd@rgrdlaw.com,amartis@rgrdlaw.com,JGeorge@rgrdlaw

- **Lloyd Winawer**
  lwinawer@goodwinlaw.com,jmckenzie@goodwinlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)